## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
## MIAMI DIVISION

### CASE NO. 10-61428-CIV-ALTONAGA/Simonton

**EVELYN FONTANEZ**, *et al.*,

      Plaintiffs,

vs.

**AL LAMBERTI**, *et al.*,

      Defendants.

_____/

### <u>ORDER</u>

**THIS CAUSE** came before the Court on Defendants, Santiago Vazquez ("Vazquez"), Michael Francis ("Francis"), and Samuel Wagers's ("Wagers['s]") (collectively "Deputy Defendants[']") Motion for Summary Judgment . . . ("Deputy Motion") [ECF No. 38]; and Defendant, Alfred T. Lamberti's Motion for Summary Judgment . . . ("Sheriff Motion") [ECF No. 40], both filed on August 12, 2011. Defendants seek final summary judgment disposing of all of the claims raised by Plaintiffs, Evelyn Fontanez and Alfred Fontanez, the natural parents of Jonathan Fontanez. The Court has carefully considered the parties' written submissions, arguments, and the applicable law.

### I. BACKGROUND

#### A. The Death of Jonathan Fontanez

On August 10, 2008, Defendant, Deputy Samuel Wagers, a member of the Broward Sheriff's Office ("BSO") "pulled the daily warrant report" and saw that Jonathan Fontanez ("Jonathan") "had

Case No. 10-61428-CIV-ALTONAGA/Simonton

two high felony outstanding and active arrest warrants[1] for robbery with a deadly weapon and aggravated battery." (Defendants, Santiago Vazquez, Michael Francis and Samuel Wagers's Statement of Undisputed Facts in Support of Motions for Summary Judgment ("Deputy SMF") ¶ 2 [ECF No. 37]). After completing surveillance operations, Wagers received authorization to serve the warrant at the Fontanez residence. (*See id.* ¶¶ 3–4). Following authorization, a group of deputies were gathered to serve the warrant. Sergeant Vazquez ensured all deputies were identifiable as BSO Deputies, and they reviewed intelligence. (*See id.* ¶¶ 5–6). Plaintiffs dispute that the Deputies were readily identifiable. (*See* Deputy SMFO ¶¶ 5–6). Included in the intelligence the Defendants considered were a picture of Jonathan Fontanez and information that Jonathan had earlier run from the police. (*See id.* ¶ 7).

Following the intelligence briefing, the Deputies proceeded to the Fontanez residence. There, they split up and stationed themselves in both the front and rear of the Fontanez home in case Jonathan chose to run. (*See id.* ¶ 8 & n.3). Deputies Wagers and Francis were located at the rear of the home, with Sergeant Vazquez, Detective Nuno Roque, and Deputy Andre Crosby located at the front of the house. (*See id.* ¶¶ 8–9).

Once the Deputies were in position, the parties' versions of the events diverge. Defendants maintain that Detective Roque knocked loudly on the door and yelled "Broward Sheriff's Office." (*Id.* ¶ 9). This was loud enough for Wagers and Francis to hear in the rear of the home. (*See id.* ¶ 11). In response, a female voice, later identified as Plaintiff, Evelyn Fontanez, asked "Who is it?"

---

1 There is no dispute concerning the warrant's validity. (*See* Plaintiffs' Statement of Disputed Material Facts in Support of Plaintiffs' Response to Defendants, Santiago Vazquez, Michael Francis, and Samuel Wagers's Motion for Summary Judgment ("Deputy SMFO") ¶ 1 [ECF No. 64]).

Case No. 10-61428-CIV-ALTONAGA/Simonton

(*Id.* ¶ 10).  When Ms. Fontanez opened the door, the front-yard Deputies heard noises from the back of the home.  (*See id.* ¶ 12).

Plaintiffs offer a different version.  They contend the Deputies did not knock and announce their presence.  (*See* Deputy SMFO ¶ 9).  Rather, they maintain Jonathan and his friend, Chris Norona, believed burglars were in the yard.  (*See id.*).  Plaintiffs also insist that because there was no knock and announce, Ms. Fontanez could not have asked who was at the door.  (*See id.* ¶ 10).

Regardless of how or why he did it, Jonathan Fontanez came to the back door armed with an aluminum baseball bat.  (*See* Deputy SMF ¶ 13).  When Jonathan stepped outside, Wagers patted the badge on his belt in order to identify himself as a BSO Deputy.  (*See id.* ¶ 15).  Jonathan looked down and saw the badge.  (*See id.*).  The backyard Deputies then may or may not have yelled "Sheriff's Office."  (*Compare id.* ¶¶ 14, 17, *with* Deputy SMFO ¶¶ 14, 17).

After patting his belt, Wagers tried to tackle Jonathan to prevent him from running.  (*See* Deputy SMF ¶ 16).  In turn, Jonathan smashed Wagers over the head with the bat, twice, fracturing his skull and causing him to bleed "profusely."  (*Id.* ¶¶ 16, 19, 20).  When Jonathan prepared to bludgeon Wagers a third time with the bat, Deputy Francis jumped into the fracas.  (*See id.* ¶ 21).  Jonathan, in turn, smashed Francis in the hand and head with the bat, rupturing a tendon in his hand.  (*See id.* ¶¶ 25).

After Jonathan cracked both Deputies with the bat, the three tangled and fell into the house.  (*See id.* ¶¶ 22, 27–29).  As they struggled, Jonathan kept swinging the bat, striking the wall several times.[2]  (*See id.* ¶ 23).  Wagers kept telling Jonathan to "stop resisting" because they were "cops."

---

[2] Plaintiffs dispute many of Defendants' facts regarding the fight.  (*See* Deputy SMFO ¶¶ 23–25). But as Plaintiffs concede, and as discussed in greater detail below, the bat was already on the floor by the

(*Id.* ¶ 30).  In addition, Francis used his taser on Jonathan to no effect.  (*See id.* ¶ 35).

As the fight progressed, Roque and Crosby ran to the back of the house.  (*See id.* ¶ 33).  Sergeant Vazquez remained at the front, where he eventually caught Jonathan's friend, Chris Norona, attempting to sneak out through the front door.  (*See id.* ¶ 34).  Sergeant Vazquez then escorted Chris to the rear of the house.  (*See id.*).

After all BSO Officers were located in the rear, Sergeant Vazquez ordered Detective Roque to use his taser on Jonathan.  (*See id.* ¶ 37).  Roque deployed his taser two to three times on Jonathan, with no effect.  (*See id.*).  Instead of becoming incapacitated, Jonathan grabbed Roque's pant leg and pulled him to the ground.[3]  (*See id.* ¶ 38).  Once Roque was on his knees, Jonathan began to punch him.  (*See id.*).  Roque, like Wagers, told Jonathan to stop resisting.  (*See id.* ¶ 40).  Clearly, Jonathan did not follow orders.

As the fight continued, Deputy Francis both saw and felt Jonathan reach for his gun.  (*See id.* ¶¶ 41–42).  At the time of these events, Deputy Francis had a Safariland Automatic Locking System ("ALS") holster.  (*See id.* ¶ 52).  According to Safariland, the holster's manufacturer, the

---

time Ms. Fontanez began to witness the fight.  (*See id.* ¶ 25).  Ms. Fontanez did not witness the early portion of the fight and any part of the fight where the bat was being used; that all occurred before she arrived on the scene.  Defendants' testimony regarding Jonathan swinging the bat and striking the Deputies, therefore, is undisputed.  Christopher Norona does discuss Jonathan's bat attack, but does not contradict the Defendants' version of events.  (*See generally* Christopher Norona Statement [ECF No. 37-16]).

[3]  Plaintiffs dispute Detective Roque's version, calling it "incredible."  (*See* Deputy SMFO ¶ 38).  In doing so Plaintiffs ask the Court to consider the credibility of witnesses.  (*See id.* ¶ 6).  Credibility determinations are not proper on summary judgment.  *See Allen-Sherrod v. Henry Cnty. Sch. Dist.*, 248 F. App'x 145, 147 (11th Cir. 2007) ("It is a hornbook principle that it is not proper for a district court to assess witness credibility when consider[ing] a motion for summary judgment as such determinations are reserved for the jury.").  Indeed, Plaintiffs' position is premised on an unstated argument that the Detective is lying; but "when challenges to witness' credibility are *all* that a plaintiff relies on, and he has shown no independent facts — no proof — to support his claims, summary judgment in favor of the defendant is proper."  *Springer v. Durflinger*, 518 F.3d 479, 484 (7th Cir. 2008) (citation omitted).

holster is not "snatch proof." (*See id.*).[4]  As Jonathan reached for the gun, Francis began to yell "[h]e's going for my gun[, h]e's going for my gun." (*Id.* ¶ 42).  Additionally, Francis took evasive physical maneuvers to prevent Jonathan from grabbing Francis's gun. (*See id.* ¶¶ 43, 45).  Despite Francis's best efforts, Jonathan grabbed the gun. (*See id.* ¶ 44).  At that point, Francis began to yell "he's got my gun[, h]e's got my gun," and told Jonathan to "let go, let go." (*Id.* ¶¶ 44–45).[5]

In an attempt to remove Jonathan's hand from the gun, Deputy Crosby kicked Jonathan and stepped on his hand. (*See id.* ¶ 46).  Sergeant Vazquez then asked Francis, "he's got your gun?" to which Francis frantically replied, "he's got my gun!" (*Id.* ¶ 48).  After personally seeing Jonathan's hand on Francis's gun, Vazquez ordered Jonathan to remove his hand and stop resisting. (*See id.*

---

[4] Although Plaintiffs do not contest that Safariland states the ALS holster is not "snatch proof," they assert this is merely "an attempt to avoid future liability." (Deputy SMFO ¶ 52).  They further maintain Defendants have not shown a situation where a gun was actually snatched from a Safariland ALS holster. (*See id.*).  However, the evidence, discussed in detail below, is that the holster is not snatch proof.  Simply saying "that is not true," basing the assertion on speculation rather than personal knowledge or facts, is not evidence of its falsity. *See Tana v. Dantanna's*, 611 F.3d 767, 775 n.7 (11th Cir. 2010) (The nonmoving party cannot create a genuine issue of material fact through speculation, conjecture, or evidence that is "merely colorable" or "not significantly probative.").  Plaintiffs have not introduced any *evidence* showing that the ALS holster is 100 percent snatch proof.  Even Plaintiffs' expert asserts "there's no such thing as a snatch proof holster." (Dr. George L. Kirkham Dep. 89:3–4 [ECF Nos. 78-1, 78-2]).

[5] Plaintiffs dispute Defendants' facts in paragraphs 41 through 45 of their Statement, maintaining Defendants' version is "impossible." (Deputy SMFO ¶¶ 45).  This is, again, an attack on Defendants' credibility and, as discussed, is not appropriate.  Once a defendant has moved for summary judgment, "the plaintiff may not respond simply with general attacks upon the defendant's credibility, but rather must identify affirmative evidence from which a jury could find that the plaintiff has carried his or her burden . . . ." *Crawford-El v. Britton*, 523 U.S. 574, 600 (1998); *Allen v. City of New York*, Nos. 03-CV-1668 (DLI)(KAM), 03-CV-3869 (DLI)(KAM), 03-CV-5323 (DLI)(KAM), 03-CV-4646 (DLI)(KAM), 2006 WL 1071576, at *6 (E.D.N.Y. Apr. 21, 2006) (quoting *Crawford-El*, 523 U.S. at 600).  Plaintiffs fail to provide affirmative evidence that Defendants are lying, or that Jonathan did not, in fact, grab the gun.  For example, although claiming Jonathan did not grab Deputy Francis's gun, neither Ms. Fontanez nor Chris Norona testified that Jonathan did not grab the gun.  Ms. Fontanez actually testified that she did not see Jonathan's hands during the struggle. (*See* Evelyn Fontanez Dep. 154:4–5,170:9–15, Feb. 15, 2011 [ECF Nos. 37-14, 37-15]).  Additionally, Defendants assert DNA evidence confirmed Jonathan grabbed Francis's gun. (*See* Crime Laboratory Analysis Report [ECF No. 37-20] (finding Deputy Francis's gun's grip contained a DNA profile from Jonathan Fontanez)).

¶ 49).  This exchange was broadcast over the police radio.  (*See id.*).  When Jonathan ignored Vazquez's order and refused to remove his hand from Francis's gun, Vazquez fatally shot Jonathan once in the upper chest.  (*See id.* ¶ 50).

### B.  The Deputies' Training

BSO Deputies receive training even after graduating from the police academy.  (*See* Defendant, Alfred T. Lamberti . . . Statement of Undisputed Facts in Support of Motion for Summary Judgment ("Lamberti SMF") ¶¶ 3, 23 [ECF No. 39]).  The training includes guidance on serving arrest warrants, arresting suspects, and taking suspects into custody.  (*See id.*).  Plaintiffs, while acknowledging training occurs, quibble with some of the details of that training.  (*See* Plaintiffs' Statement of Disputed Material Facts in Support of Plaintiffs' Response to Defendant Al Lamberti's Motion for Summary Judgment ("Lamberti SMFO") ¶¶ 3, 23 [ECF No. 65]).  As a result of training, any deputy can pull and execute an arrest warrant.  (*See* Lamberti SMF ¶ 4).

Pursuant to BSO policy, a deputy must confirm a warrant is active before physically arresting a suspect.  (*See id.* ¶ 5).  Wagers followed that policy here, having Sergeant Vazquez verify the warrant for Jonathan Fontanez.  (*See id.* ¶ 6).

BSO policy also requires that before executing an arrest, out-of-uniform deputies must display a badge of authority.  (*See id.* ¶ 7).  Here, pursuant to that policy, Vazquez inspected all five Deputies, verifying they were all identifiable as BSO Deputies.  (*See id.* ¶¶ 8–9).  Plaintiffs, however, contend the Deputies were not all readily identifiable.  (*See* Lamberti SMFO ¶¶ 8–9).  Further, although there were five Deputies at the Fontanezes' home on August 11, 2008 (including Sergeant Vazquez and Detective Roque) (*see* Lamberti SMF ¶ 13), there is no set number of BSO Deputies

required to execute an arrest warrant (*see id.* ¶ 12).

Before entering a dwelling, BSO policy requires deputies to "knock and announce their authority." (*Id.* ¶ 10). Prior to knocking and announcing, deputies usually position themselves both at the front and back of a residence because suspects often run out the back. (*See id.* ¶ 11). Here, Wagers and Francis were positioned at the rear of the Fontanez residence, with Vazquez, Roque, and Crosby at the front. (*See id.* ¶ 13). Consistent with BSO policy, Roque knocked and announced "Broward Sheriff's Office." (*Id.* ¶¶ 14–17). Plaintiffs contend no knock and announce occurred. (*See* Lamberti SMFO ¶¶ 14–17).

BSO policy allows for the use of deadly force "based on a reasonable belief that he or she, a fellow deputy [as is the case here], or another person, faces imminent danger of death or great bodily harm." (Lamberti SMF ¶ 22) (alteration in original). As part of this policy, deputies are trained that even if they are using an ALS holster, if a person grabs a deputy's gun, that is considered a deadly force situation. (*See id.* ¶ 31).[6] To support its deadly-force policy, the BSO exceeds Florida guidelines and provides "use of force" training annually. (*See id.* ¶¶ 25–26).

## C.    The Second Amended Complaint

Counts I through III of the Second Amended Complaint ("Amended Complaint") [ECF No. 60] state claims against Vazquez, Francis, and Wagers, respectively, under 42 U.S.C. Section 1983, for violations of the Fourth and Fourteenth Amendments. Count IV states a section 1983 claim against Lamberti in his official capacity as Sheriff of Broward County. Count V, directed to

---

[6] Plaintiffs do not dispute that this policy exists, but assert it is an "unjustified, [and] inappropriate" policy that "constitutes deliberate indifference to the individuals that the Broward Sheriff's office comes into contact with." (Lamberti SMFO ¶ 31).

Vazquez, Wagers, and Francis, and Count VI, directed to Lamberti in his official capacity, state wrongful death claims.

## II.  SUMMARY JUDGMENT STANDARD

Summary judgment shall be rendered "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).  In making this assessment, the Court "must view all the evidence and all factual inferences reasonably drawn from the evidence in the light most favorable to the nonmoving party," *Stewart v. Happy Herman's Cheshire Bridge, Inc.*, 117 F.3d 1278, 1285 (11th Cir. 1997), and "must resolve all reasonable doubts about the facts in favor of the non-movant." *United of Omaha Life Ins. Co. v. Sun Life Ins. Co. of Am.*, 894 F.2d 1555, 1558 (11th Cir. 1990).

The Deputies' Motion addresses the qualified immunity defense, and as noted, certain material facts are in dispute.  Nonetheless, "'[t]o deny summary judgment any time a material issue of fact remains . . . could undermine the goal of qualified immunity to avoid excessive disruption of government and permit the resolution of many insubstantial claims on summary judgment.'" *Robinson v. Arrugueta*, 415 F.3d 1252, 1257 (11th Cir. 2005) (quoting *Saucier v. Katz*, 533 U.S. 194, 201 (2001) (quotations and citations omitted)).  Thus,

> [w]hen conducting a qualified immunity analysis, district courts must take the facts in the light most favorable to the party asserting the injury.  *Saucier*, 533 U.S. at 21[1].  When a district court considers the record in this light, it eliminates all issues of fact.  By approaching the record in this way, the court has the plaintiff's best case before it.  With the plaintiff's best case in hand, the court is able to move to the question of whether the defendant committed the constitutional violation alleged in the complaint without having to assess any facts in dispute.

Case No. 10-61428-CIV-ALTONAGA/Simonton

*Id.*

## III.  ANALYSIS

### A.  The Deputies' Motion

#### 1.  *Qualified Immunity*

The Deputy Defendants argue they are entitled to qualified immunity from the section 1983 claims.  (*See* Deputy Mot. 4–16).  "Qualified immunity offers complete protection for government officials sued in their individual capacities if their conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'"  *Kingsland v. City of Miami*, 382 F.3d 1220, 1231 (11th Cir. 2004) (quoting *Vinyard v. Wilson*, 311 F.3d 1340, 1346 (11th Cir. 2002)).  In order to be entitled to the qualified-immunity defense, a government official must demonstrate that the acts complained of were committed within the scope of the officer's discretionary authority.  *Id.* at 1232.  Once the officer has done so, "the burden shifts to the plaintiff to show that qualified immunity is not appropriate."  *Lee v. Ferraro*, 284 F.3d 1188, 1194 (11th Cir. 2002); *see also McClish v. Nugent*, 483 F.3d 1231, 1237 (11th Cir. 2007); *Montoute v. Carr*, 114 F.3d 181, 184 (11th Cir. 1997) ("[O]nce an officer or official has raised the defense of qualified immunity, the burden of persuasion as to that issue is on the plaintiff.").  This is embodied in the Eleventh Circuit's two-part *Zeigler/Rich* analysis:

> 1.  The defendant public official must first prove that "he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred."
>
> 2.  Once the defendant public official satisfies his burden of moving forward with the evidence, the burden shifts to the plaintiff to show lack of good faith on the defendant's part.  This burden is met by proof demonstrating that the defendant public official's actions

Case No. 10-61428-CIV-ALTONAGA/Simonton

"violated clearly established constitutional law."

*Courson v. McMillian*, 939 F.2d 1479, 1487 (11th Cir. 1991) (quoting *Rich v. Dollar*, 841 F.2d 1558, 1563 (11th Cir. 1988); *Zeigler v. Jackson*, 716 F.2d 847, 849 (11th Cir. 1983) (per curiam)).[7]

In order to prevent dismissal of his or her claims under the doctrine of qualified immunity, a plaintiff must show that the facts, taken in the light most favorable to the plaintiff, demonstrate the defendant violated a constitutional right.  *See Saucier*, 533 U.S. at 201; *Sharp v. Fisher*, 532 F.3d 1180, 1183 (11th Cir. 2008); *McClish,* 483 F.3d at 1237.  Even if the facts demonstrate a violation, the plaintiff still has the burden to show that the constitutional rights were "clearly established" at the time of the violation in order to survive summary judgment.  *See Saucier*, 533 U.S. at 201; *Sharp*, 532 F.3d at 1183; *McClish*, 483 F.3d at 1237.  Decisions of the United States Supreme Court, the Eleventh Circuit, and the Supreme Court of Florida can clearly establish law in this jurisdiction.  *See McClish*, 483 F.3d at 1237.  For the law to be "clearly established," it must be so clear that every objectively reasonable official understands it to prohibit the challenged act.  *See Vinyard*, 311 F.3d at 1353.  The purpose of this requirement is to "ensure that before they are subjected to suit, officers are on notice their conduct is unlawful."  *Saucier*, 533 U.S. at 206.

> That the very act (or something materially similar to it) in question has previously been held unlawful by a court is not always necessary. But in light of preexisting law, the unlawfulness must be apparent: plain, clear, obvious.  Unless the government official's act is so obviously wrong, in the light of preexisting law, that only a plainly incompetent official or one who was knowingly violating the law would have committed the act, the official is entitled to qualified immunity.

---

[7]  District judges now have the discretion to decide which of the two prongs of the qualified immunity analysis should be addressed first.  *See Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

Case No. 10-61428-CIV-ALTONAGA/Simonton

*Snider v. Jefferson State Cmty. Coll.*, 344 F.3d 1325, 1328 (11th Cir. 2003); *Montoute*, 114 F.3d at 184 ("[T]he qualified immunity standard is broad enough to cover some 'mistaken judgment,' and it shields from liability 'all but the plainly incompetent or those who knowingly violate the law.'" (quoting *Malley v. Briggs*, 475 U.S. 335, 343 (1986)).

Here it is undisputed that the Deputy Defendants were government officials performing discretionary functions at the time of the conduct at issue. Therefore, the burden shifts to Plaintiffs to demonstrate that Defendants violated a clearly established statutory or constitutional right to overcome the qualified immunity defense. They have failed to do so.

**2. *Alleged Constitutional Violations***

a. *Fourth Amendment*

i. <u>*Reasonableness*</u>

It is undoubtedly true that the Deputy Defendants used force — deadly force — against Jonathan Fontanez during an arrest. "Where, as here, the excessive force claim arises in the context of an arrest . . . of a free citizen, it is most properly characterized as one invoking the protections of the Fourth Amendment, which guarantees citizens the right 'to be secure in their persons . . . against unreasonable . . . seizures' of the person." *Graham v. Connor*, 490 U.S. 386, 394 (1989) (quoting U.S. Const. amend. IV); *Garczynski v. Bradshaw*, 573 F.3d 1158, 1166 (11th Cir. 2009) ("Any claim that a law enforcement officer used excessive force whether deadly or not during a seizure of a free citizen must be analyzed under the Fourth Amendment's 'reasonableness' standard.") (quoting *Graham*, 490 U.S. at 395). The question, then, is were the Deputy Defendants reasonable in their use of force?

11

"Determining whether the force used to effect a particular seizure is 'reasonable' under the Fourth Amendment requires a careful balancing of '"the nature and quality of the intrusion on the individual's Fourth Amendment interests"' against the countervailing governmental interests at stake." *Graham*, 490 U.S. at 396 (citations omitted). The Supreme Court has long held that the right to arrest entails the right to use "some degree" of force. *Id.* However, determining the proper degree of force — the reasonable amount — "'is not capable of precise definition or mechanical application . . . ." *Id.* (quoting *Bell v. Wolfish*, 441 U.S. 520, 559 (1979)). Rather, the Court must pay "careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* The question is "whether the totality of the circumstances justified a particular . . . seizure." *Tennessee v. Garner*, 471 U.S. 1, 8–9 (1985). "'[I]n the end [the Court] must still slosh [its] way through the factbound morass of "reasonableness."'" *Garczynski*, 573 F.3d at 1166 (quoting *Scott v. Harris*, 550 U.S. 372, 396 (2007)).

When determining whether the Deputy Defendants' use of force was reasonable, the Court must judge the Deputies' actions "from the perspective of a reasonable officer on the scene . . . ." *Graham*, 490 U.S. at 396. "The *only* perspective that counts is that of a reasonable officer on the scene at the time the events unfolded," with the "sole inquiry [being] whether the officer's actions, as taken, were objectively reasonable under all the circumstances." *Garczynski*, 573 F.3d at 1166–67 (emphasis added) (citing *Graham*, 490 U.S. at 396). When addressing that inquiry, the Court may not use "the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396. "'Not every push or shove, even

if it may later seem unnecessary in the peace of a judge's chambers,' violates the Fourth Amendment." *Id.* (citation omitted).  Rather, "[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments in circumstances that are tense, uncertain, and rapidly evolving about the amount of force that is necessary in a particular situation." *Id.* at 396–97.

This reasonableness inquiry is an objective one.  "[T]he question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Id.* at 397.  Neither the Deputies' good nor evil intentions may be considered.  *See id.* "Under the *Zeigler*/*Rich* formulation of the objective-reasonableness test, a government official proves that he acted within his discretionary authority by showing '"objective circumstances which would compel the conclusion that his actions were undertaken pursuant to the performance of his duties and within the scope of his authority."'" *Courson*, 939 F.2d at 1487 (quoting *Rich*, 841 F.2d at 1564).

Because this determination is being made by the Court at summary judgment, the Deputy Defendants must "establish [their] entitlement to qualified immunity as a matter of law by showing that no genuine issues of material fact relating to the implicated legal questions exist." *Id.* at 1486 (citing *Hutton v. Strickland*, 919 F.2d 1531, 1536 (11th Cir. 1990)).  "An opposing plaintiff must show that the defendant is not entitled to qualified immunity legally or that there is a genuine issue of material fact regarding the defendant's conduct as being violative of the clearly established law governing the case." *Id.* at 1487 (citing *Hutton*, 919 F.2d at 1536).

The Court now returns to the particular facts of this case.  At issue is the Deputy Defendants'

Case No. 10-61428-CIV-ALTONAGA/Simonton

use of deadly force when reacting to Jonathan Fontanez's violent outburst. "It is well established that a police officer may use [] deadly force in self-defense." *Gutierrez v. City of Hialeah*, 723 F. Supp. 1494, 1498 (S.D. Fla. 1989) (citing *O'Neal v. DeKalb Co., Ga.*, 850 F.2d 653 (11th Cir. 1988); *Garner*, 471 U.S. at 11–12). The Supreme Court has held that to find such defensive action "unreasonable would 'severely hamper effective law enforcement.'" *Id.* (quoting *Garner*, 471 U.S. at 19). As the Supreme Court explained in *Garner*,

> Where the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others, it is not constitutionally unreasonable to prevent escape by using deadly force. Thus, if the suspect threatens the officer with a weapon or there is probable cause to believe that he has committed a crime involving the infliction or threatened infliction of serious physical harm, deadly force may be used if necessary to prevent escape, and if, where feasible, some warning has been given.[8]

*Garner*, 471 U.S. at 11–12.

The circumstances here constituted an extreme situation, one which the Court must view from the perspective of a reasonable and cautious police officer on the scene. *See Courson*, 939 F.2d at 1496. The police react to circumstances as they encounter them, and the arrestee's conduct will often dictate the police's response. *See id.* On the night of August 11, 2008, the Deputies stepped into an urgent and inherently dangerous situation — a man with two open felony arrest warrants for robbery with a deadly weapon and aggravated battery was armed with a bat and was swinging it and striking them, he was not responsive to physical restraint or multiple taser shocks, and he ultimately

---

[8] The Eleventh Circuit has construed this quote and stated "[a] more sensible interpretation of the above quoted passage is that a police officer may, under certain circumstances, use deadly force to prevent the escape of a suspect; it does not mean that the use of deadly force is limited to those instances where a suspect is trying to escape." *O'Neal*, 850 F.2d at 658 n.7.

14

Case No. 10-61428-CIV-ALTONAGA/Simonton

placed his hand on an officer's gun.

ii.   *The Deputy Defendants Were Reasonable in Their Use of Deadly Force.*

Under the totality of the circumstances, *see Garner*, 471 U.S. at 8–9, the Defendants' use of deadly force against Jonathan Fontanez was reasonable. Taking all facts in the light most favorable to Plaintiffs, there are no questions of material fact; the Deputy Defendants are entitled to qualified immunity.

In viewing the totality of the circumstances, and in determining whether the Defendants' use of deadly force was reasonable, the Court begins with what the Defendants knew prior to their attempt to execute the arrest warrant. Defendants were aware that Jonathan Fontanez was sought for violent crimes (*see* Michael Francis Dep. 45:3–12, 216:12–14, Apr. 26, 2011 [ECF Nos. 37-5, 37-6]), that he "ran the streets," and that he "[d]idn't care too much for authority" (Samuel Wagers Dep. 38:14–17, 40:3–9, Apr. 27, 2011 [ECF No. 37-4]). Defendants also knew Jonathan was alleged to have beaten a man with brass knuckles (*see id.* 43:18–44:11; Francis Dep. 215:11–13), held a man at gunpoint (*see* Wagers Dep. 43:18–44:11), and was wanted for armed robbery[9] (*see* Francis Dep. 45:3–9). The BSO Deputies were also told by Jonathan's father that Jonathan may have been on steroids. (*See id.* 29:24–30:5.) Finally, the Deputy Defendants understood that Jonathan was a runner and was likely to flee their arrest attempt.[10] (*See* Wagers Dep. 44:19–21, 89:4–7; Francis

---

[9] Jonathan's mother was somewhat unaware of Jonathan's alleged crimes. (*See, e.g.*, Fontanez Dep. 52:16–17). It is also apparent she lacks personal knowledge concerning many of the events that occurred on the night of August 11, 2008, and of many of the allegations in the Amended Complaint. (*See id.* 111:24–10; 166:11–172:16).

[10] Plaintiffs assert this was an erroneous "Police rumor." (Deputy SMFO ¶ 7). They contend the runner was, in fact, Jonathan's older brother. (*See id.*; Kathy Raphael Dep. 17:22–20:2, June 13, 2011 [ECF No. 79]). Whether or not Jonathan was actually a runner, the relevant fact is Defendants *believed* he was a

Dep. 45:14–16; Santiago Vazquez Dep. 53:1–25, 65:13–66:8, June 10, 2011 [ECF No. 37-7]; Nuno

Michael Roque Dep. Vol. I 19:14–19, May 26, 2011 [ECF No. 37-8]; Andre Crosby Dep.

52:8–53:25, Apr. 28, 2011 [ECF No. 37-11]).

Because the Defendants understood Jonathan was a runner, their arrest plan, incorporating

BSO "protocols" (Mary Tiger Dep. 31:19–34:12, July 1, 2012 [ECF No. 37-10]), called for two

deputies to place themselves in the Fontanezes' back yard in case Jonathan decided to flee (*see*

Wagers Dep. 60:21–23). That night, most of the Deputies were wearing "tactical" clothing[11] instead

of dress uniforms. (*See id.* 76:2–7). The two Deputies who made first contact with Jonathan,

Wagers and Francis, each wore some item of clothing or paraphernalia that clearly identified them

as deputies.[12] Francis wore a t-shirt with the words "Broward Sheriffs" on the front, and he had a

---

[11] Sergeant Vazquez explains that a tactical uniform is any manner of dress, such as the display of a badge, that identifies the deputy as a Broward Sheriff; it is a dress-down uniform. (*See* Vazquez Dep. 27:6–9, 31:19–32:2).

runner, and as a result, placed two BSO Deputies in the Fontanezes' back yard to prevent Jonathan from fleeing. (*See* Urey Patrick Dep. 100:8–101:13, July 25, 2011 [ECF No. 42-1]). Finally, a police rumor is just another term for police *intelligence*. (*See id.* 100:4).

[12] Plaintiffs dispute that Wagers's badge was visible on his belt but submit no evidence in support of their position. For example, Wagers, as well as every other witness, testified that Wagers was in a tactical uniform, including a BSO hat with a visible badge on his belt. Plaintiffs, themselves, submit pictures of Wagers's clothing indisputably showing that he was, in fact, wearing the badge. (*See* [ECF No. 65-1] (picture of Wagers's outfit and belt with badge attached)). Plaintiffs nevertheless assert that perhaps Jonathan did not know it was a badge, but could have thought it was a belt buckle. (*See* Deputy SMFO ¶ 6). That is not evidence, but mere speculation. *See Marshall v. City of Cape Coral, Fla.*, 797 F.2d 1555, 1559 (11th Cir. 1986) ("Inferences based upon speculation are not reasonable," and may not defeat a motion for summary judgment.). It is also speculation that Chris Norona, Jonathan's friend, directly refutes in his sworn declaration, where he states that he immediately identified the Deputies in tacticals as police. (*See* Norona Statement 3–4, 6–8).

Nevertheless, in her affidavit, Ms. Fontanez states she did not see a badge or identifying marks on the Deputies fighting Jonathan. (Evelyn Fontanez Aff. ¶ 5 [ECF No. 65-5]). In her earlier deposition, however, she states the two Deputies — Wagers and Francis — had their backs to her the "whole time." (Fontanez Dep. 162:4–8). Because she only saw the Deputies' backs, she does not create an issue of fact as

screen-printed or embroidered "star badge" (*see* Francis Dep. 50:24–52:4; Deputy SMFO ¶ 5); and

Wagers had his badge visible on his belt[13] as well as a BSO hat (*see* Wagers Dep. 76:21–78:1,

84:2–4; Francis Dep. 55:19–21; Vazquez Dep. 30:22–31:12; Roque Dep. Vol. I 60:17–19). Wagers

was also wearing his gun belt, had handcuffs, and a radio. (*See* Wagers Statement 2 [ECF No. 79]).

They were thus readily identifiable as BSO Deputies. (*See* Norona Statement 6–7 ("Q. No the two

guys that were bleeding [Wagers and Francis], how do you know they were Deputies? A. Oh cause

they had, they had the tee shirts. Q. That said Sheriff on it? A. Yes.").

Whether the Deputies knocked and announced at the front door is disputed.

(*Compare* Wagers Dep. 96:13–97:9, Francis Dep. 63:18–68:18, Vazquez Dep. 69:16–74:8; Roque

Dep. Vol. I 81:4–83:15 *with* Fontanez Aff.[14] ¶¶ 2–4; Raphael Dep. 61:14–63:13). It is, however,

irrelevant to the analysis here. Assuming for the moment that Plaintiffs' version is accepted and

---

to whether the Deputies were properly identifiable as BSO deputies. *See McCormick v. City of Fort Lauderdale*, 333 F.3d 1234,1240, n.7 (11th Cir. 2003) ("Under the law of this Circuit, we may disregard an affidavit submitted solely for the purpose of opposing a motion for summary judgment when that affidavit is directly contradicted by deposition testimony."). The testimony and evidence demonstrate that Wagers wore his badge on his belt on his *front*. Further, Plaintiffs concede Francis's shirt said "Broward Sheriffs" on the *front*. (Deputy SMFO ¶ 5). Because Ms. Fontanez never saw their fronts, she could not properly contradict the *evidence* showing Wagers wore his badge at his front, and Francis wore the words "Broward Sheriffs" on his front.

[13] This conforms with the BSO's policy manual. (*See* Sheriff's Policy Manual § 10.8 [ECF No. 37-10] ("Deputies not in uniform should display their badge of authority . . . .")).

[14] Technically, although Ms. Fontanez asserts she did not hear the Deputies "knock and announce" or yell "Broward Sheriff's" or "Sheriff's Office" (Fontanez Aff. ¶¶ 2–4), she also she states she was asleep and only woke up when she heard a loud noise, which turned out to be the struggle between Wagers, Francis, and Jonathan (*see* Fontanez Dep. 131:9–138:5). Although she asserts she is a troubled sleeper whose heart drops at any noise (*see* Fontanez Dep. 126:13–24, 134:10–14, 137:14–18), there is really no way for her to have personal knowledge of what happened while she was sleeping. It is also apparent that Ms. Fontanez slept through a good portion of the night's events, particularly Jonathan's bashing two Deputies over the head with a bat. The Court *could* therefore simply accept the Deputies' undisputed testimony that they knocked and announced. It is only for Plaintiffs' benefit that the Court does not. But it is also irrelevant to the question of whether or not the use of deadly force was reasonable once Jonathan grabbed Francis's gun.

Jonathan ran out the back because he believed there were burglars, as soon as he saw Wagers and

Francis he must have been aware they were deputies.  First, this is based upon the Deputies' dress.

As described, Wagers and Francis wore items clearly identifying them as police.  There is also

undisputed[15] testimony that when Jonathan stepped outside, Wagers patted his badge and Jonathan

looked down and saw it.  (*See* Wagers Dep. 98:20–99:1).

Second, this is based on Chris Norona's sworn statement.  Chris states that although he, too,

believed at first that burglars were outside, when he stepped outside and saw the Deputies in tactical

outfits, he immediately recognized them as police and dropped the knife he was carrying.[16]  (*See*

---

[15]  Plaintiffs seek to have the Court "strike any reference as to what Jonathan Fontanez 'saw' on the night of the incident." (Deputy SMF ¶ 15).  They assert that because Jonathan was killed and cannot testify, Defendants should be barred from this type of testimony as well.  The Court rejects this request.  Defendants are free to state their perceptions of what they saw on the night in question.  Furthermore, even if the Florida Dead Man's Statute existed, it would not apply here.  *See* FLA. STAT. § 90.602(1) (1996), *repealed by* Laws 2005, c. 2005-46, § 1, eff. July 1, 2005.  "Under the Florida Dead Man Statute, an 'interested person' to a court proceeding is disqualified from testifying to 'any *oral communication* between the interested person and the person who is deceased . . . .'" *VanEtten v. Primerica Life Ins. Co.*, No. 97-1248-CIV-T-17C, 1997 WL 809762, at *2 (M.D. Fla. Nov. 7, 1997) (emphasis added) (quoting FLA. STAT. § 90.602(1) (1996)). Here, Wagers is not describing any *oral* communications.

Further, even if a dead-man act existed, this is a federal-question case, not a case where diversity of citizenship is asserted, and the Dead Man's Statute would not apply.  *See Savarese v. Agriss*, 883 F.2d 1194, 1200 n.10 (3d Cir. 1989) ("Appellees correctly conclude that the Pennsylvania Dead Man's Statute would not apply to this federal claim."); *Longoria ex rel. Longoria v. Wilson*, 730 F.2d 300, 304 (5th Cir. 1984) (not applying Texas Dead Man's Statute because the case was a section-1983 federal-question case); *cf. Lovejoy Elecs., Inc. v. O'Berto*, 873 F.2d 1001, 1005 (7th Cir. 1989) ("Although as we have said the Illinois dead man's statute is applicable to this federal diversity case").  Were this case to go to trial, Plaintiffs could attack Defendants' credibility concerning their statements about Jonathan's actions or statements.  But here, on summary-judgment motions, Defendants' statements concerning what Jonathan either said or did are undisputed.  *See Blue v. Int'l Bhd. of Elec. Workers-Local 159*, 726 F. Supp. 2d 1009, 1011 n.1 (W.D. Wis. 2010) ("While defendant is free to attack the credibility at trial of statements attributed to [the deceased] as Local 159's agent, such evidence is undisputed at summary judgment because no federal statute bars its admission.").

[16]  It is unclear whether Chris first went out the back, or went directly to the front door.  Chris's Statement implies that he and Jonathan both went to the back door.  (*See* Norona Statement 3).  Then it appears that Chris, *after* seeing the Deputies in the back, tried to sneak out the front door.  (*See id.* 4).  Plaintiffs' position is just that, that Chris first followed Jonathan to the back door.  (*See* Deputy SMFO ¶ 14).

Norona Statement 3–4, 6–8).  Chris knew the two men who were bleeding — Wagers and Francis — were deputies because of the BSO t-shirts.  (*See id.* 6; *see also* Francis Dep. 50:24–52:4 (stating Francis wore a t-shirt that said "Broward Sheriff" and had a "star badge")).  In addition, when Chris recognized the "burglars" as police, he told Jonathan to stop swinging the bat.  (Norona Statement 8) ("That's the reason I dropped the knife, cause I seen the [Sheriff] shirt and I told [Jonathan] yo' stop.").  Ms. Fontanez's statements that her son did not recognize the Deputies as police are not accepted, and do not create an issue of fact, because they are not based on personal knowledge.  Considering that she was asleep and in bed and not with her son when he stepped outside, her statement could only be based on speculation or hearsay.  Finally, although Defendants maintain they yelled out "Broward's Sheriff" and similar identifying statements, others state they did not hear this.  The Court therefore does not consider this fact when evaluating the Defendants' actions.

When Jonathan came outside with a bat, Wagers attempted to stop him from fleeing.  Jonathan responded by bashing Wagers over the head with that bat.[17]  (*See* Wagers Dep. 101:5–13, 104:7–9; Francis Dep. 69:21–22, 72:1–4, 72:13–17, 74:21–75:4).  He would end up hitting Wagers twice more on the head, as well as on the body (*see* Wagers Dep. 107:1–11, 111:18–25), and would also hit Francis on the head and hand.  (*See* Francis Dep. 87:4, 89:11–19, 99:15–100:22, 108:18–21).  As soon as Jonathan Fontanez threatened use of a baseball bat — and actually did use that bat by

---

If Chris went first to the back door and immediately recognized Wagers and Francis as police, causing him to drop the knife, then this strongly supports Defendants' version of events, that Jonathan recognized Wagers and Francis as police (which is based on Chris's personal knowledge), and refutes Plaintiffs' version, that Jonathan did not recognize Wagers and Francis as police (which is not based on personal knowledge but rather is based on mere speculation).

[17]  Wagers ended up with a skull fracture and multiple lacerations.  (*See* Wagers Dep. 136:1–4).

smashing two Deputies on the head — he used deadly force, justifying the Defendants' defensive use of deadly force. *See Garner*, 471 U.S. at 32 (O'Connor, J., dissenting) (noting a baseball bat is potentially lethal); *Mulnix v. McNeil*, No. 8:03-CV-500-T-30MSS, 2008 WL 238711, at *3 (M.D. Fla. Jan. 28, 2008) (petitioner convicted of murder after beating victim to death with baseball bat); *Britt v. Judd*, No. 804CV1723T27MSS, 2006 WL 2792889, at *1 (M.D. Fla. Sept. 27, 2006) (granting defendants summary judgment, finding they were entitled to qualified immunity, where they shot and killed Britt after Britt held a bat over his head in a striking position and in a deadly manner); (John Kelly Dep. 44:45:6, June 28, 2011 [ECF No. 37-22]); (Kirkham Dep. 157:18-23, 167:18–168:3).[18]   Further, contrary to the plaintiff in *Britt v. Judd*, who was justifiably killed after only threatening use of a baseball bat, here Jonathan was not only holding a bat and moving it aggressively, he repeatedly struck Deputies with the bat.  *See Britt*, 2006 WL 2792889, at *1.  As soon as Jonathan threatened use of the bat — and actually used it — the Deputies were entitled to respond with deadly force.  They did not, however, use it at that time.

After Jonathan bludgeoned two BSO Deputies with the baseball bat,[19] a struggle erupted in

---

[18] The deadly nature of an aluminum baseball bat was emphasized recently when a husband beat and killed his wife — Polk County Sheriff's Office's highest civilian employee — with an aluminum bat. *See* Stephanie Wang, *Polk Sheriff's Official Killed With Baseball Bat at Plant City Home; Husband Held*, St. Petersburg Times, Sept. 19, 2011, *available at* http://www.tampabay.com/news/publicsafety/plant-city-husband-accused-of-beating-his-wife-a-polk-sheriffs-official-to/1192277.

[19] Plaintiffs submit no proper evidence contradicting Defendants' version of events regarding Jonathan's use of the baseball bat.  Ms. Fontanez testified that when she discovered Wagers and Francis in their struggle with Jonathan, the bat was already on the floor.  (*See* Fontanez Dep. 145:4–10).  She therefore did not witness Jonathan's initial hostilities toward the police, his smashing of the police with a bat, and how the fight began.  Any comments she makes are not based on personal knowledge.  Conversely, Chris states Jonathan saw the Deputies and just started swinging the bat, despite Chris telling him to stop.  (*See* Norona Statement 3–8).

which the Defendants tried to subdue and arrest Jonathan, and Jonathan violently resisted.[20]  (*See* Wagers Dep. 107:1–132:14).   During the course of this struggle, the Defendants continually attempted to use non-lethal force to restrain and control Jonathan while Jonathan continued to swing the bat. (*See id.* 111:1–114:7).  Defendants documented how they struggled with their bare hands. (*See id.* 116:8–118:21; Francis Dep. 94:13–14).  But Jonathan was stronger.  (*See* Francis Dep. 102:15–18).  Defendants explain how they used their tasers two or three times on Jonathan.  (*See id.* 143:21–157:8; Roque Dep. Vol. I 91:10–106:16; Crosby Dep. 84:14–21; *see also* Norona Statement 6).  But Jonathan was unfazed.[21]  (*See* Francis Dep. 143:21–157:8; Roque Dep. Vol. I 91:10–106:16; Crosby Dep. 84:14–21, 114:14–17).  Defendants describe how they verbally commanded Jonathan to stop resisting.  (*See* Wagers Dep. 123:11–18; Francis Dep. 130:4–6, 159:10–17, 187:10–12; Roque Dep. Vol. I 101:12–102:4).  But Jonathan ignored them.  (*See* Crosby Dep. 108:4–7).  Even Jonathan's mother and friend urged him to stop resisting.  (*See* Fontanez Dep. 153:16–154:3, 163:10–20; Norona Statement 8).  But Jonathan chose to continue physically and violently resisting. (*See* Fontanez Dep. 153:16–154:3; Norona Statement 8).

Having both been struck on their heads with the bat, the two BSO Deputies directly involved in the scrum became weakened from the physical confrontation as well as from blood loss.  Wagers, as soon as he was first bludgeoned on his head, feared for his life.  (*See* Wagers Dep. 106:6–10). Francis testified that he became increasingly fearful for his life as the struggle went on, nervous that

---

[20] Ms. Fontanez was unaware of why the Deputies and Jonathan were fighting; she was unaware that Jonathan had bashed them over the head with a baseball bat.  (*See* Fontanez Dep. 154:11–21).

[21] Jonathan had been exposed to marijuana and oxycodone.  (*See* Toxicology Report [ECF No. 37-19]).

Case No. 10-61428-CIV-ALTONAGA/Simonton

if Jonathan's hands got free with the bat, he would be killed. (*See* Francis Dep. 95:24–25, 96:16–20, 98:6–7, 102:2–3, 102:15–103:3). Francis was also worried about Wagers, who was so covered in blood that Francis could only identify him by his blue eyes. (*See id.* 131:22–132:6; *see also* Vazquez Dep. 85:17–18).

As the struggle continued, Jonathan again placed the Defendants in imminent threat[22] of great bodily harm or death.[23] While Jonathan, Wagers, and Francis battled on the floor, Jonathan began to grab at Francis's gun. (*See* Francis Dep. 107:18–109:19, 111:10–113:9, 160:23–163:1). Francis — already weary from blood loss and fatigue — repeatedly yelled out "he's going for my gun." (*Id.* 160:8–9, 193:10–13; Wagers Dep. 152:2–5, 129:7–14; Vazquez Dep. 106:6–20; Roque Dep. Vol. I 108:5–25). Francis also began to take evasive physical maneuvers to prevent Jonathan from grabbing the gun. (*See* Francis Dep. 160:9–18, 163:7–164:25; Vazquez Dep. 110:19–24; Crosby Dep. 95:5–98:1).

---

[22] Sergeant Pennypacker explains the difference between an imminent threat and an immediate threat, either of which justifies the use of deadly force. (*See* Bill Pennypacker Dep. 40:7–25, 41:2–14, June 30, 2011 [ECF No. 37-21]). When a person places his hands on an officer's gun in the holster, but does not remove it, that is an "imminent" threat. When the gun is removed from the holster, that is an "immediate" threat.

[23] The Court here will, for Plaintiffs' benefit, draw an arbitrary line. That arbitrary line will divide the night's events into two separate scenarios. *Scenario One* is the initial contact — Jonathan coming outside with a bat and hitting Wagers and Francis with it. *Scenario Two* is Jonathan grabbing Francis's gun. Under either scenario, the Defendants were justified in using deadly force. However, for the purposes of this comment, the Court will accept that perhaps Jonathan *did* believe he was defending his house from burglars. Assuming everything Plaintiffs say is true (including the inadmissible speculative testimony not based on personal knowledge) and Jonathan Fontanez believed in good faith he was acting in defense of his "castle" when he hit Wagers and Francis on their heads with the bat, this still does not bear on the use of deadly force under *Scenario Two*. By the time Jonathan grabbed Francis's gun (*Scenario Two*), he was aware that he was fighting police. At that point, there can be no claim that Jonathan was acting under a good-faith belief that burglars were at his home. In any event, Jonathan's awareness of the wrongfulness of his conduct is irrelevant to deciding the Deputies' reasonableness in using deadly force in self-protection. When Jonathan grabbed Francis's gun, the Defendants were justified and reasonable in their use of deadly force.

Despite Francis's verbal and physical responses, Jonathan grabbed Francis's gun.  (*See* Francis Dep. 165:3–168:14; Vazquez Dep. 120:22–121:12; Nuno Michael Roque Dep. Vol. II 7:11–13, 24:16–18 July 5, 2011 [ECF No. 37-9])).  As stated, Jonathan's DNA was on Francis's gun.[24]  (*See* Crime Laboratory Analysis Report).  When Jonathan grabbed Francis's gun, Francis began to yell out "he's got my gun."  (Francis Dep. 165:5–166:3, 193:10–13; Wagers Dep. 131:12–18; Vazquez Dep. 106:6–20).  Having grasped Francis's gun, Jonathan again placed the BSO Deputies in imminent threat of death or great bodily harm, filling the Deputies with fear of death. (*See* Vazquez Dep. 111:17–114:22; Roque Dep. Vol. I 110:14–20).  Sergeant Vazquez then joined the chorus, yelling at Jonathan Fontanez to drop the gun.  (*See* Vazquez Dep. 124:15; Roque Dep. Vol. II 18:25–19:2, 20:4–7; Crosby Dep. 94:17–95:3; Norona Statement 4).  Jonathan refused to heed the Deputies; he refused to let go of the gun, and deadly force was used as Vazquez fatally shot Jonathan one time in the chest.  (*See* Vazquez Dep. 126:6–129:18; Roque Dep. Vol. II 19:2–8).

Given the circumstances presented by these undisputed facts, the Deputies were reasonable in their use of deadly force.  The situation was a life-or-death struggle with a drugged-up, violent, and resistant felon.  The situation began with that person pummeling two officers on their heads with a baseball bat.  The situation ended with that person grabbing a Deputy's gun.  In a rapidly evolving and tense situation, the Defendants were required to make split-second decisions.  The Deputy Defendants first attempted to use non-lethal force to subdue Jonathan, using their words, fists, and tasers, but Jonathan refused to stop.  Then, as soon as Jonathan grabbed a gun, the Defendants were

---

[24]  Additionally, as discussed, the testimony that Jonathan grabbed Francis's gun is undisputed because neither Ms. Fontanez nor Chris Norona states Jonathan did not grab the gun, and Ms. Fontanez testified she could not see Jonathan's hands.  (*See* Fontanez Dep. 154:4–5,170:9–15; Norona Statement).

— for the second time that night — justified in using deadly force.

Plaintiffs make much of the fact that Francis's gun was enclosed in a Safariland ALS holster. (*See* Deputy Mot. Opp'n 7–8 [ECF No. 43]).  They contend that the Defendants should have known that, due to the type of holster Francis was using, Jonathan would not have been able to remove the gun.  (*See id.*).  They therefore maintain Defendants were not justified in using reasonable force. (*See id.*).

Plaintiffs' argument fails to persuade.  Their contention that Jonathan could not have removed the gun from the ALS holster is a 20/20 hindsight argument.  *See Graham*, 490 U.S. at 396. The Deputies were not required to wait until Jonathan had Deputy Francis's gun out of the holster in his hand and was aiming it at them before using deadly force.  *See Garczynski*, 573 F.3d at 1169 ("At least where orders to drop the weapon have gone unheeded, an officer is not required to wait until an armed and dangerous felon has drawn a bead on the officer or others before using deadly force.'") (quoting *Montoute*, 114 F.3d at 185).  During the struggle, the Deputies had a justified fear that Jonathan would successfully remove Francis's gun from the holster.  (*See* Francis Dep. 169:19–171:1; Vazquez Dep. 106:21–107:1).  Furthermore, at the time this incident occurred, ALS holsters were not prolific throughout the BSO; only a few had been distributed.  (*See* Francis Dep. 77:15–19).  During a life-or-death struggle with a gun, following blows to the head by a suspect's baseball bat, officers are not required to calculate the odds of a fugitive successfully snatching a gun from a holster before being found to have been justified in their use of deadly force.[25]  Finally, whether or not the holster is an ALS holster has no bearing on whether a threat is imminent.  (*See*

---

[25]   Deputy Roque testified that he had heard of guns being fired while still within a Safariland holster.  (*See* Roque Dep. Vol. I 46:10–17).

Case No. 10-61428-CIV-ALTONAGA/Simonton

Pennypacker Dep. 45:15–21).

Plaintiffs' argument is also factually flawed. Clearly, guns can be removed from an ALS holster.[26] Otherwise, the holster would fail to serve its intended function. The BSO trains its deputies that a perpetrator can snatch a gun from a holster; if a deputy can remove a gun from a holster so can someone else. (*See* Pennypacker Dep. 33:21–34:8; Kelly Dep. 45:14–18). Safariland itself states no holster is "snatch-proof." (Safariland Owner's Manual [ECF No. 73] ("Do not rely on any holster being 'snatch proof.' There is no such holster. Rely only on extensive, proper training and vigilance."); *see also* Thomas Campbell Dep. 9:8–10:15, July 28, 2011 [ECF No. 37-24]). Thomas Campbell, a Safariland technical specialist, testified that the holster is designed to delay a person from snatching an officer's gun for five seconds. (*See id.* 13:7–17). The longer a struggle lasts, the more likely it is that a gun will be snatched from a Safariland ALS holster (or any holster). (*See id.* 14:5–7; 28:23–29:4). An officer may never "100 percent" rely "on the fact that a suspect will not be able to get a gun out of this holster[.]" (*Id.* 15:3–6).

The struggle on the floor here lasted for at least ten to twenty seconds.[27] Additionally, Campbell stated that it is not that difficult to figure out how to remove a gun from an ALS holster. (*See* Campbell Dep. 20:24–21:7). And it does not matter which hand the person grabs the gun with; guns can be removed from an ALS holster regardless of which hand the person uses. (*See, e.g.*, Roque Dep. Vol. II 42:15–43:6). Defendants were not required to wait and see if Jonathan could

---

[26] Evidently, directions on how to remove a gun from an ALS holster are readily available on the internet. (*See* Pennypacker Dep. 45:23–46:22).

[27] Plaintiffs, in arguing that there was not an imminent threat to the BSO Deputies, assert that, *if* Jonathan grabbed the gun, there was enough time for the Deputies to take some non-lethal action. (*See* Deputy SMFO ¶¶ 48).

Case No. 10-61428-CIV-ALTONAGA/Simonton

ultimately figure out how to remove the gun and actually removed it; they did not have to wait until a Deputy or Deputies were shot in order to use deadly force. (*See, e.g.*, Kelly Dep. 46:9–47:13; Patrick Dep. 122:1–5).

"Although [Jonathan Fontanez's] 'fundamental interest in his own life need not be elaborated upon,' even such a weighty interest may be counterbalanced by governmental interests in effective law enforcement, as in this case." *O'Neal*, 850 F.2d at 657–58 (citation omitted). Based on the foregoing, the Deputy Defendants are granted summary judgment on Counts I–III.

### b. *Fourteenth Amendment*

Plaintiffs also assert their section 1983 claims arise under the Fourteenth Amendment, contending the Deputy Defendants violated Jonathan's substantive due process rights. (*See* Deputy Mot. Opp'n 9–10). In support of their position that they may proceed under the Fourteenth Amendment, Plaintiffs cite to *Fundiller v. Cooper City*. (*See* Deputy Mot. Opp'n 9) (citing *Fundiller v. Cooper City*, 777 F.2d 1436 (11th Cir. 1985)). However, four years after *Fundiller*, the Supreme Court held in *Graham* "that all claims that law enforcement officers have used excessive force deadly or not in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard, rather than under a 'substantive due process' approach." *Graham*, 490 U.S. at 395. Since the time *Graham* was decided, the Eleventh Circuit has made it abundantly clear that the Fourteenth Amendment is inapplicable to claims such as Plaintiffs'. *See Hamm v. Powell*, 893 F.2d 293, 294 (11th Cir. 1990); *Battiste v. Lamberti*, 571 F. Supp. 2d 1286, 1292 n.2 (S.D. Fla. 2008).

26

Case No. 10-61428-CIV-ALTONAGA/Simonton

### 3. *Wrongful Death*

In addition to the federal claims, Plaintiffs assert state-law claims. They contend that Defendants' wrongful acts caused Jonathan Fontanez's death. (*See* 2d Am. Compl. ¶¶ 69–74 [ECF No. 60]).

"Florida's Wrongful Death Act allows for recovery when the death of a person is caused by, *inter alia*, negligence or a 'wrongful act,' which includes the use of excessive force by a police officer." *Vaughn v. City Orlando*, No. 6:07-cv-1695-Orl-19GJK, 2009 WL 3241801, at *8 (M.D. Fla. Sept. 29, 2009). Although Florida's Wrongful Death Act allows for recovery where the death is caused by negligence, when a plaintiff's allegations concern excessive force, the liability must arise from intentional torts. *See id.* ("Any liability under state law attributed to Officer Smith for the use of excessive force must arise from the intentional tort of battery, not negligence.") (citing *City of Miami v. Sanders*, 672 So. 2d 46, 48 (Fla. 3d DCA 1996)). "[I]t is not possible to have a cause of action for 'negligent' use of excessive force because there is no such thing as the 'negligent' commission of an 'intentional' tort." *Sanders*, 672 So. 2d at 48.

Law-enforcement officers are authorized under Florida law to use force in making an arrest:

> A law enforcement officer, or any person whom the officer has summoned or directed to assist him or her, need not retreat or desist from efforts to make a lawful arrest because of resistance or threatened resistance to the arrest. The officer is justified in the use of any force:
>
> > (1) Which he or she reasonably believes to be necessary to defend himself or herself or another from bodily harm while making the arrest;
> >
> > (2) When necessarily committed in retaking felons who have escaped; or

> (3) When necessarily committed in arresting felons fleeing
> from justice.  However, this subsection shall not constitute a
> defense in any civil action for damages brought for the
> wrongful use of deadly force unless the use of deadly force
> was necessary to prevent the arrest from being defeated by
> such flight and, when feasible, some warning had been given,
> and:
>
>> (A) The officer reasonably believes that the fleeing
>> felon poses a threat of death or serious physical harm
>> to the officer or others; or
>>
>> (B) The officer reasonably believes that the fleeing
>> felon has committed a crime involving the infliction
>> or threatened infliction of serious physical harm to
>> another person.

Fla. Stat. § 776.05.  Under section 776.05(1), "'[l]aw enforcement officers are provided a complete defense to an excessive use of force claim where an officer "reasonably believes [the force] to be necessary to defend himself or another from bodily harm while making the arrest."'" *Btesh v. City of Maitland*, No. 6:10–cv–71–Orl–19DAB, 2011 WL 3269647, at *26 (M.D. Fla. July 29, 2011) (quoting *Sanders*, 672 So. 2d at 47).  The question of whether or not deadly force was reasonable under section 776.05(1), as with the Fourth Amendment, is an objective inquiry.  *See id.*  "[A] police officer is entitled the defense under Section 776.05(1) merely by establishing that the use of force was objectively reasonable." *Id.* (citing *Sanders*, 672 So. 2d at 47).  Plaintiffs concede the inquiry is an objective one.  (*See* Deputy Mot. Opp'n 11).

Because the Court has already found the Defendants' actions were objectively reasonable as a matter of law with regard to the section 1983 claims, the Defendants are entitled to the section 776.05(1) defense as a matter of law as well.  *See Penley v. Eslinger*, 605 F.3d 843, 855–56 (11th

Case No. 10-61428-CIV-ALTONAGA/Simonton

Cir. 2010); *Btesh*, 2011 WL 3269647, at *26. For the reasons stated, there are no issues of fact; the

Deputies' belief that deadly force was necessary to defend from bodily harm while arresting the

violently resisting Jonathan was reasonable. *See Btesh*, 2011 WL 3269647, at *26. Summary

judgment is therefore granted in the Deputy Defendants' favor on Count V.

### B. The Sheriff's Motion

#### 1. *Section 1983 Liability*

The argument that Chief Lamberti should be held liable on the basis of *respondeat superior*

or vicarious liability can quickly be discarded. "It is well established that § 1983 claims may not be

brought against supervisory officials on the basis of vicarious liability or *respondeat superior*."

*Keating v. City of Miami*, 598 F.3d 753, 762 (11th Cir. 2010) (citing *Belcher v. City of Foley*, 30

F.3d 1390, 1396 (11th Cir. 1994)); *Gutierrez*, 723 F. Supp. at 1499 ("The law is well established that

an action pursuant to Section 1983 cannot be based upon the theory of *respondeat superior*. A

plaintiff must establish that a supervisor . . . actually exercised control over the officer in connection

with the conduct at issue (i.e., shooting).") (citing *Monell v. Dep't of Soc. Serv. of City of New York*,

436 U.S. 658 (1978); *Fundiller*, 777 F.2d 1436; *Gilmere v. City of Atlanta*, 774 F.2d 1495 (11th Cir.

1985)).

A supervisor may be held liable, however, "'when the supervisor personally participates in

the alleged constitutional violation or when there is a causal connection between actions of the

supervising official and the alleged constitutional violation.'" *Keating*, 598 F.3d at 762 (quoting

*Gonzalez v. Reno*, 325 F.3d 1228, 1234 (11th Cir. 2003)). There is no showing (or allegations in the

Amended Complaint) that Chief Lamberti personally participated in Jonathan's death, so he may

only be held liable if there is a causal connection between his alleged actions and the beating.

A causal connection may be established when:

> [1] a history of widespread abuse puts the responsible supervisor on notice of the need to correct the alleged deprivation, and he fails to do so[;] . . . [2] when a supervisor's custom or policy . . . result[s] in deliberate indifference to constitutional rights[;] . . . [3] when facts support 'an inference that the supervisor directed the subordinates to act unlawfully[;] or [4] knew that the subordinates would act unlawfully and failed to stop them from doing so.

*Cottone v. Jenne*, 326 F.3d 1352, 1360 (11th Cir. 2003) (internal citations and quotation marks omitted).  Here, Plaintiffs assert that causal connection arises from the BSO's official policies.  (*See* 2d Am. Compl. ¶¶ 58–60, 64–68).  They also assert a causal connection in Sheriff Lamberti's failure to train, screen, supervise, and control his Deputies; failure to determine whether the Deputy Defendants posed a threat to the public; and failure to ensure that the Deputy Defendants did not violate Jonathan's constitutional rights.  (*See id.* ¶¶ 61–63, 64–68).

The Court has already determined that the Deputies did not violate Jonathan Fontanez's constitutional rights.  Because no constitutional violation occurred, nothing Sheriff Lamberti did — even assuming he failed to train, screen, supervise, or control his Deputies — *caused* a constitutional violation.  Having determined no constitutional violation has occurred, an "[a]nalysis of a state entity's custom or policy is unnecessary." *Garczynski*, 573 F.3d at 1170; *Case v. Eslinger*, 555 F.3d 1317, 1328 (11th Cir. 2009).  Defendant Lamberti is therefore granted summary judgment on Count IV.

### 2. *State-Tort Liability.*

Sheriff Lamberti also seeks summary judgment on Plaintiffs' final claim brought under

Florida's Wrongful Death Statute.  (*See* Sheriff Mot. 9–11 [ECF No. 40]).  Plaintiffs seek to hold Sheriff Lamberti vicariously liable under the Wrongful Death Statute.  (*See* 2d Am. Compl. ¶ 79).

"'A person whose liability is imputed based on the tortious acts of another is liable for the entire share of comparative responsibility assigned to the other.'" *Am. Home Assur. Co. v. Nat'l R.R. Passenger Corp.*, 908 So. 2d 459, 467 (Fla. 2005) (quoting Restatement (Third) of Torts: Apportionment of Liability § 13 (2000)).  Of paramount importance in finding vicarious liability is that the underlying alleged tortfeasor actually be found liable of tortious acts.  If the alleged tortfeasor is not liable, no liability can be imputed upwards.  *See Mobil Oil Corp. v. Bransford*, 648 So. 2d 119, 121 (Fla. 1995) ("[D]ismissal of any claim against an apparent agent also requires dismissal . . . against the apparent principal. . . .  [A]pparent agency is a theory of vicarious liability imputing the acts of the agent to the principal[.]  [I]f the agent cannot be held liable, neither can the principal, because there is nothing to impute.).

The Court has already granted summary judgment on Plaintiffs' wrongful-death claim against the Deputy Defendants.  Finding the Defendants' actions were objectively reasonable, the Deputy Defendants are entitled to the section 776.05(1) defense.

Because the Court found no Deputy Defendant may be held liable, Sheriff Lamberti cannot be vicariously liable for the Deputy Defendants' actions.  Without any underlying liability, there can be no apportionment of that liability to Sheriff Lamberti; any percent of zero is zero.  *See Mobil Oil*, 648 So. 2d at 121 (Fla. 1995); *Anderson Trucking Serv., Inc. v. Gibson*, 884 So. 2d 1046, 1051 (Fla. 5th DCA 2004) ("The courts have consistently held that a party may not be held vicariously liable if the tortfeasor is exonerated.) (citing *Mobil Oil*, 648 So. 2d at 121; *Bankers Multiple Line Ins. Co.*

Case No. 10-61428-CIV-ALTONAGA/Simonton

*v. Farish*, 464 So. 2d 530 (Fla. 1985); and *Georgia-Pac. Corp. v. Reid*, 501 So. 2d 653 (Fla. 5th DCA 1986)).  Sheriff Lamberti is granted summary judgment on Count VI.

## IV. CONCLUSION

For the reasons set forth above, it is

**ORDERED AND ADJUDGED** that the Deputies' Motion **[ECF No. 38]** and the Sheriff's Motion **[ECF No. 40]** are **GRANTED**.   A final summary judgment shall be entered by separate order.  All other pending motions are denied as moot.

**DONE AND ORDERED** in Chambers at Miami, Florida, this 27th day of September, 2011.

_____
**CECILIA M. ALTONAGA**
**UNITED STATES DISTRICT JUDGE**

cc:      counsel of record